Miles P. McDonald, J.
Petitioners, members of the board of directors of the Brownsville Community Council, an antipoverty agency, initiated this proceeding to restrain respondents, from conducting the proposed elections for the Local Policy Committee of the Model Cities Agency, and restraining respondents from circulating petitions for candidates in such elections. Petitioners also seek public hearings with reference to the proposed plan of elections.
Respondents, by their answer and supporting affidavits, seek judgment dismissing the proceeding on the grounds that the petition fails to state facts sufficient to justify the relief sought; they also allege full compliance with the law in formulating the policies and procedures to provide widespread citizen participation and, in formulating said policies and procedures, they have in no way acted unreasonably, arbitrarily, capriciously or contrary to law.
The Model Cities Program is a comprehensive approach to rebuild and revitalize blighted and slum areas in our cities under the Demonstration Cities and Metropolitan Development Act of *444 1966, as amended (IT. S. Code, tit. 42, § 3301 et seq.), which makes available grants and technical assistance to enable city demonstration agencies to plan and carry out programs to effectuate the legislative intent. Locally the Model Cities Program is implemented by Executive Order No. 55/67 which established the Model Cities Committee and Executive Order No. 8/70 which dissolved the Model Cities Committee and created in its place the Model Cities Administration, presently the over-all administrative bureau in charge of the city-wide Model Cities Program, both executive orders promulgated by the office of the Mayor. Central Brooklyn Model Cities Area involved in this proceeding comprises the area designated Brownsville, East New York and Bedford-Stuyvesant.
The issue presented in this proceeding is the validity ..of the proposed election plan for the Central Brooklyn Model Cities Policy Committee, scheduled to be held on May 21,1971.
The enabling legislation enacted by Congress and the implementing Executive Orders specifically direct “ widespread citizen participation ’ ’. How such participation is to be obtained is not mandated. Thus, there is no obligation upon the Model Cities Administration to conduct elections for membership on the local planning committee. However, it was decided by the Model Cities Administration that an election was the best procedure to secure broad based citizens’ support. Accordingly the election method was utilized at the inception of the Model Cities Program in the early spring of 1968. Each of the designated areas conducted its own elections in a series of convention meetings. Members and delegates were elected for a term of five years or until the next election, whichever occurred first, thus tenure of the present board would terminate upon the happening of alternate contingencies. A call for new elections and designations having been made, the terms of office of the entire present sitting body are considered expired, leaving the way open for new elections and appointments for all members including those 12 of the .present board who are to be nominated and appointed to provide continuity and experience to the new body. Information concerning the elections was distributed to eight hundred organizations throughout the central Brooklyn area.
The plan as amended would establish a local planning committee of 38 members, an increase of 3 over the present 35-member committee. There are three districts in the Central Brooklyn Model Cities area, each of which contains three sub-districts. The proposed plan would retain 12 of the existing board members to be selected by the present board. The chairman *445 of each Community Corporation (antipoverty agency) operating in the area would be entitled to full voting membership; members of the board of directors and the executive staff of the Community Corporations are specifically disqualified from holding any office. Five members would represent special community interests (business, religious, educational, community health and social welfare). To reconstitute the three area policy committees, the Citywide Model Cities Board (which is composed of both the city government officials appointed by the Mayor and of representatives selected by and from the three existing local policy committees) met on several occasions to formulate and ultimately approve and adopt a set of election policies and procedures which is the subject of this proceeding. In the business and religious category, any group of at least three of their respective number may nominate one candidate for appointment to the local planning committee. Any nominee seeking to represent the educational interest must submit ten nominating signatures of professional educators who are residents of the Model Cities area. A community health nominee must be a doctor, dentist or registered nurse and must obtain five signatures of members of their profession. The board of directors of any local- social welfare agency may nominate one of its officers or one -of its full time employees. The administrator, in consultation with the neighborhood directors of the respective Model Cities areas shall then appoint one from each of the classes mentioned from the list of nominees compiled. One adult representative (over the age of 18) would be elected from each subdistrict. To be nominated, a candidate of such district must present a petition bearing the valid signatures of 100 residents of. the subdistrict which he seeks to represent. Also, to be elected six youth representatives (aged 16 to 18), two of whom would come from each district. Voters would be permitted to vote for only one youth representative from each district and the one receiving the highest number of votes to serve a term of one year.
Finally, three senior citizens (over the age of 65) would be-elected, one from each of these districts. A senior citizen candidate, like the other two classes of representatives, in order to have his name placed on the ballot, must present a nominating petition signed by 100 residents of the district he seeks to represent, with the provision that no person may sign more than one nominating petition for each class of representatives. One shall be elected from each district to -serve a term of two years.
While the complexity of the plan is not one that would recommend it to the court it is lawful and it is not within the court’s *446 province to substitute its judgment for that of the Model Cities Administration.
The proposal also provides for voter registration, petitions, challenges and other sundry related provisions. .
Petitioners challenge the election guidelines on the broad general principle that they do not encourage maximum feasible participation of the poor.
Specifically, petitioners allege that retaining 12 members of the present board without requiring an election of those members deprives the residents of the opportunity to elect the required members of the Local Policy Committee and further reducing the number of eligible candidates that may be elected from the area.
Petitioners also challenge that portion of the guidelines which disqualifies the antipoverty board members and their executive staff from holding office. They argue that this exclusionary provision would deprive the residents of the Central Brooklyn area from electing representatives of their choice and prevents the representation of a number of residents who are actively participating in the improvement of the community.
Petitioners further question the validity of having the youth representatives and senior citizens elected at large. They question the manner in which the various classes of persons shall be nominated. Specifically, they object to those provisions which limit the voter to nominating only one of each class.
The court is of the opinion that there is no merit to petitioners’ objections. The enabling legislation and subsequent executive pronouncements require only that there be “ active citizen participation ’ ’. As stated by Mr. Justice Gone of this court, in the Matter of Battice v. Central Brooklyn Model Cities Policy Committee (Sup. Ct., Kings County, Sp. Term Part I, Index Nos. 13713/70, 14251/70 and 15023/70, dated Feb. 23, 1971), “ both the Federal statute and the implementing Executive Orders contain mere statements of general principle requiring only ‘ widespread citizen participation ’ but do not specify the manner in which these principles are to be translated into practice ”. Again, in the case of North City Area-Wide Council v. Romney (428 F. 2d 754, 758), the Federal court had occasion to interpret the meaning of the term “active citizen participation ’ ’ under the statute in question and declared, 1 ‘ the issue is not citizen veto or even approval, but citizen participation, negotiation and consultation in the major decisions which are made for the particular Model Cities Program ”. The statute is discretionary in nature, limited only to the extent that there be active citizen participation. The election proposals sub *447 mitted clearly show that a determined effort was made here to provide widespread citizen participation in the election procedures. The plan provided for appointive and elective devices to insure the election of a wide segment of the population in the area. Provisions are made for the election of the very young and the old, special interests, as well as the public at large.
Constitutionally, it is only when the initial legislation directs the use of popular elections that there must then be compliance with constitutional safeguards (Hadley v. Junior Coll. Dist., 397 U. S. 50). In the case at bar, the enabling legislation does not require elections, on the contrary, the statute uses the word “ participation ” not “ representation ”, a subtle but pertinent distinction. The plan adopted herein is merely an extension of the discretionary power granted to the local administrator under the statute.
Moreover, the Supreme Court has upheld against constitutional challenge an election plan that required that candidates be residents of certain districts that did not contain equal numbers of people (Dusch v. Davis, 387 U. S. 112). It has also been held that where a State chooses to select members of an official body by appointment rather than election, and that choice does not itself offend the Constitution, the fact that each official does not ‘' represent ’ ’ the same number of people does not deny those people equal protection of the laws (Sailors v. Board of Educ., 387 U. S. 105).
Finally, the words of Mr. Justice Black in the Hadley case (supra, p. 59) seem most appropriate, “ viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation ”. The proposal under attack is such an innovative" experiment; the proposal amply provides for widespread citizen participation called for by the statute.
It should be noted that though the board of directors of the Community Corporations and their executive staff are disqualified from holding office, their voices have not been muted but are adequately represented on the Planning Committee through the membership of the chairmen of their respective organizations. Moreover, the court finds that the nomination procedures and the selection processes are all in accord with legal precedent (see Dusch v. Davis, supra ; Sailors v. Board of Educ., supra ; Matter of O’Rourke v. Cohen, 265 N. Y. 318). The court is convinced that there was proper dissemination, *448 publication and distribution of the proposed guidelines among the community at large to justify a denial of a public hearing on the proposals as suggested by petitioners (see Newsletter of March 18, 1971 ; Community Memorandum of March 15, 1971, reproduced by one of the petitioners, Brownsville Community Council).
Accordingly, petitioners’ motion is denied in all respects and respondents are granted judgment dismissing the petition.